## UNITED REAL ESTATE & TRUST CO. v. BLOCHMAN et al.

(Circuit Court of Appeals, Ninth Circuit. August 20, 1917.)

No. 2899.

1. MORTGAGES ⬤⇒310—POWER OF TRUSTEE—RELEASE OF LOTS—PART PAYMENT.
    The owner of land, on part payment by the purchaser, called the beneficiary, conveyed to a trustee under a trust agreement providing that the property might be subdivided into lots, that the signature of the trustee, with acknowledgment of the map or plat of the subdivision, should bind all parties, that the trustee was authorized to sign and acknowledge as proprietor such map or plat, subdividing the lands, as should be presented to it for signature by the beneficiary, that the land, when subdivided, should have at least 250 lots, and that beneficiary would expend in the subdivision, laying out, platting, and preparation for sale of said real property at least the sum of $25,000, all costs and expenses of subdivision to be borne and paid by the beneficiary. It was further agreed that, when so subdivided, the property might be sold by the beneficiary on payment to the trustee, for the benefit of vendor, of a specified sum for each lot, such sum to be paid by the trustee to the vendor as soon as received, whereupon the trustee was authorized and directed to execute deeds on any lot to the order of the beneficiary. Held, that the expenditure of the $25,000 by the beneficiary was not a condition precedent to his right to sell, and to the power of the trustee to release.

---

⬤⇒For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

**2. MORTGAGES ☞310—CONSTRUCTION—TRUST DEED.**

Where a declaration of trust, pursuant to which an owner of land conveyed the same to a trustee on part payment of the price by the purchaser, is equivocal, the doubt must be resolved in favor of the trustee: the instrument having been prepared by the vendor.

**3. MORTGAGES ☞310—TRUST DEED—RELEASE OF LOT—SALE.**

Under a stipulation in a trust deed, whereby the owner on receiving part payment of the price conveyed the land to a trustee, that the vendor "does hereby authorize and direct the said trustee to execute deeds on any lot or lots to the order of the beneficiary herein, or his assigns, whenever there shall have been paid to the said trustee for the account of said [vendor] the sum per lot as hereinbefore stated," an actual sale by the beneficiary was not essential to the trustee's power to release lots; the only requisite being the payment of the sum per lot as stipulated.

**4. MORTGAGES ☞310—POWER OF TRUSTEE—RELEASE OF LOTS—PART PAYMENT.**

The further provision of such declaration of trust that, "whenever $1,000 shall be paid to said [vendor] on account of" the balance due on purchase price, "the interest on the amount so paid shall cease, and all payments made on account of sales or otherwise shall be credited on the first maturing obligation of said beneficiary," did not prevent a release of lots on payments of the stipulated sums per lot, though there were overdue installments of the balance of the price owing by the beneficiary.

**5. MORTGAGES ☞310—TRUST DEED—RELEASE BY TRUSTEE—PART PAYMENT—ESTOPPEL.**

The vendor having accepted payments pursuant to which the trustee released lots, it cannot retain the money so received, and at the same time deny the authority of the trustee to make the releases and recover the lots, in the absence of any claim of fraud or misconduct.

**6. MORTGAGES ☞310—SALE BY TRUSTEE—DISQUALIFICATION.**

Though antagonism had developed between the vendor and trustee under a deed of trust made to secure payment of the balance of the purchase price, it was not error to permit such trustee to sell the property on default of payments, where the vendor's interests were properly safeguarded by court's order, under which the trustee was authorized to perform only ministerial functions.

Appeal from the District Court of the United States for the Southern Division of the Southern District of California; Oscar A. Trippet, Judge.

Suit by the United Real Estate & Trust Company, a corporation, against Lucien A. Blochman and others. From the decree entered, plaintiff appeals. Modified and affirmed, without costs.

Isaac E. Congdon, of Omaha, Neb., and A. Haines and Charles C. Haines, both of San Diego, Cal., for appellant.

A. H. Sweet, F. W. Stearns, C. H. Forward, and R. C. Springer, all of San Diego, Cal., for appellees Union Title Co. of San Diego and Union Trust Co. of San Diego.

Sam Ferry Smith, of San Diego, Cal., and Laurence Hammond Smith, of San Francisco, Cal., for appellee Blochman.

Theron Stevens, James G. Pfaustiel, and Frank H. Heskett, all of San Diego, Cal., for appellee Haskins.

Before GILBERT and HUNT, Circuit Judges, and DIETRICH, District Judge.

DIETRICH, District Judge. The plaintiff and appellant, a Nebraska corporation, being the owner of a 40-acre tract of land within the city limits of San Diego, Cal., agreed to sell the same to the defendant Blochman for $150,000, and accordingly, $25,000 having been paid on account of the purchase price, the property was, by deed dated September 15, 1912, conveyed to the defendant Union Title & Trust Company of San Diego, to be held and disposed of by it pursuant to the terms of a declaration of trust to which plaintiff and Blochman assented. After reciting the payment of $25,000 to the plaintiff, called the payee, by Blochman, called the beneficiary, it was provided that the beneficiary was to pay to the title and trust company, called the trustee, the other $125,000, as follows: $25,000 within 9 months, $25,000 within 15 months, $25,000 within 21 months, and $50,000 within 24 months from August 1, 1912; all deferred payments to bear interest. There is a further provision, which will be more particularly referred to later, authorizing the platting of the tract by the beneficiary, and the release of lots by the trustee from the plaintiff's lien. The beneficiary was to pay all taxes, and in case of his failure to do so the plaintiff might pay the same, and the amount or amounts so paid should, with interest, "constitute an additional indebtedness to be paid by said beneficiary, and before he shall become entitled to have a deed from the trustee for any lot or part of said real property." Upon receiving the balance of the purchase price, together with interest, and an additional amount sufficient to cover taxes or other charges which the plaintiff might be compelled to pay, and the expenses of the trust, the trustee was to turn over the residue, if any, of money in its hands, to the beneficiary, and to convey to him or his assigns any unsold portion of the land. It was also provided that in case of certain defaults the plaintiff could declare the whole of the principal sum at once due and payable, and upon demand of the plaintiff it was made the duty of the trustee to sell the land in the manner and upon notice as prescribed in the declaration; detailed provision being made for such sale. Thereafter, in November, 1912, Blochman entered into an agreement with one Hampton for the assignment of his interest, and caused the tract to be surveyed by Hampton for townsite purposes, and a plat thereof, under the name of La Binda Park, to be presented to the trustee for its signature and acknowledgment, as provided in the declaration of trust, which plat, after acceptance by the city council, was filed for record in the county recorder's office on March 5, 1913. Hampton defaulted, and on April 28th Blochman transferred the contract to the La Binda Park Syndicate, a company which he had organized; the syndicate assuming his obligations as purchaser. The beneficiary (Blochman and the syndicate) fell into default on account of interest and the first payment of $25,000, and after taking some steps toward a formal declaration of default, and a foreclosure and sale of the tract, the plaintiff agreed to waive the default and accept the total amount then due according to the terms of the declaration of trust, and accordingly, on the 30th of June, 1913, the beneficiary paid to the trustee, for the credit of the plaintiff, $28,464.07, the overdue principal and interest in full. In October of the same year another payment was

made, more particularly to cover the then accrued interest of $2,671,-75. No other payments were made, and in November the beneficiary again fell into default, from which it was never relieved.

The lower court found that there was due the plaintiff, on account of principal and interest and taxes, the aggregate sum of $130,817.-90, with interest thereon from March 15, 1916, at the rate of 7 per cent. per annum, and decreed to it a first lien upon the whole of La Binda Park, with the exception of 30 lots therein, which it was held had been released by the trustee from the plaintiff's lien under the provisions of the declaration of trust. The appellant is content with the amount awarded, but maintains that its lien should extend to all of the lots, and here arises the first, and practically the only important, question. There is no serious difference of view as to the facts, and the principal controversy grows out of the construction to be given to the contract, the pertinent provisions of which are as follows:

"It is understood and agreed by the trustee, beneficiary, and the payee herein mentioned that the said real property may be subdivided into smaller tracts, lots, blocks, or subdivisions, and that the signature of the trustee herein to the proprietor's acknowledgment of the map or plat of said subdivision shall bind all the parties hereto, and the said trustee is hereby authorized and directed to sign and acknowledge as proprietor such map or plat subdividing said land as shall be presented to it for signature by the beneficiary hereunder; it being understood and agreed that said land, when subdivided as aforesaid, shall have and contain, in addition to the streets, alleys, and public grounds, at least 250 lots, none of which shall have a street frontage of more than 55 feet, except corner lots, which may have a frontage of not more than 100 feet; and it being further understood and agreed that said beneficiary will expend in the subdivision, laying out, platting and preparation for sale of said real property at least the sum of twenty-five thousand dollars ($25,000) on or before the 1st day of March, 1913.

"All the costs and expenses of said subdivision, and all surveys, mapping, platting, and filing maps, shall be borne and paid by said beneficiary.

"It is further agreed that, when so subdivided, said real property may be sold by the beneficiary hereunder, or his assigns, upon payment to the said trustee for the benefit of said payee a sum equal to one thousand dollars ($1,000) for each and every inside lot, and twelve hundred dollars ($1,200) for each and every corner lot, described in said subdivision or plat, which sums shall be paid by the trustee to the payee as soon as received in full, and without any reduction or any cost or expense whatever to the payee. And the said payee does hereby authorize and direct the said trustee to execute deeds on any lot or lots to the order of the beneficiary herein, or his assigns, whenever there shall have been paid to said trustee for the account of said payee the sum per lot as hereinbefore stated."

The releases of the 30 lots which the trustee assumed the right to give were made in connection with the raising of the money used for the two payments above mentioned, aggregating between $30,000 and $31,000. Some of the lots appear to have been sold outright, and as to certain others the precise nature of the transaction is not entirely clear; but apparently, when the suit was commenced, the trustee still held the legal title thereto, subject to declarations of trust given by it in favor of divers interested persons. But in this connection it is important to note that in every case such disposition as was made was with the understanding on the part of the trustee, the beneficiary, and the party furnishing the money that the lots would be released from the plaintiff's lien, and it is wholly improbable that any part of the

money could have been procured, or would have been paid to the plaintiff, without such an understanding. Furthermore, the beneficiary claimed the right to demand releases, as the money was paid, at the rate of one lot for each $1,000, and the trustee assumed that it was its duty to comply with such demand. These facts at once distinguish and render inapplicable certain of the decided cases relied upon in the briefs.

[1] The plaintiff objects, first, that the provision for release did not become operative, for the reason that the beneficiary failed to expend "in the subdivision, laying out, platting, and preparation for sale of said real property, at least the sum of $25,000"; its contention being that the expenditure of this amount for the purposes stated was a condition precedent to the right of the beneficiary to sell and the power of the trustee to release. Not without reason, it complains of the manner in which the tract was subdivided and platted, with streets only 25 feet in width, and alleys ·7 feet, but clearly the trustee is chargeable with no negligence in this respect, for it was granted no discretion and assumed no responsibility. It was not only authorized, but "directed," "to sign and acknowledge as proprietor such map or plat subdividing said land as shall be presented to it for signature by the beneficiary." In signing and acknowledging the plat, therefore, it simply performed its plain duty. It was under no obligation to see that $25,000 was spent before the subdivision was made. Nor, indeed, could it have been the intention of the parties that this amount should be expended before the plat was accepted and filed. Presumably most of the expenditures would be for grading the streets, clearing the lots, laying sidewalks, etc., and naturally such work would be done after the lines had become definitely fixed by the acceptance and filing of the plat.

[2] Great stress is laid upon the phrase "when so subdivided"; but, when considered in connection with the other provisions, it is somewhat of a strain to construe this language as meaning that after, and only after, the expenditure of $25,000 in platting and improving the tract, could sales be made. There is an express provision against transfers or releases so long as the beneficiary should be in default in reimbursing the plaintiff for delinquent taxes paid by it, and if the right to sell or transfer was intended to be conditioned upon the prior expenditure of $25,000 for platting and improvements, it is strange that such a condition was left unexpressed. It may be admitted that upon the whole the language is equivocal, and that the intent of the parties is left uncertain; but such 'doubt as there is must be resolved in favor of the trustee, for the reason that the instrument was prepared by the plaintiff.

[3] Nor do we think that the authority of the trustee to release was intended to be limited to cases of "sale" in the strict and narrow sense contended for by the plaintiff. No substantial reason is apparent why such restriction would be insisted upon by the plaintiff or assented to by Blochman. It was required that there should be at least 250 lots (as a matter of fact the number was greater), which, without taking into account the additional price to be paid for corner lots, would, at $1,000 each, yield twice the amount of the unpaid balance of the pur-

chase price. The plaintiff may therefore have very reasonably assumed that it was amply protected. There is no evidence that it deemed it material to know what consideration, if any, Blochman received, or what he did with the lots, provided he turned over to the trustee for its credit the stipulated amount, and we entertain no doubt that the term "sold" was used in a general sense, and that the real understanding of the parties is expressed in the sentence reading:

"And the said payee does hereby authorize and direct the said trustee to execute deeds on any lot or lots to the order of the beneficiary herein or his assigns, whenever there shall have been paid to said trustee for the account of said payee the sum per lot as hereinbefore stated."

[4] The plaintiff further contends that releases could not be given for payments made upon overdue or fully matured obligations. The basis for the argument upon this point is supposed to be found largely in the paragraph reading:

"Whenever one thousand dollars ($1,000) shall be paid to said payee on account of said sum of $125,000, the interest on the amount so paid shall cease, and all payments made on account of sales or otherwise shall be credited on the first maturing obligation of said beneficiary."

It is true that upon the payment of an overdue obligation the interest necessarily ceases to run, and an express provision to that effect would be unnecessary; but it is to be borne in mind that the language of this paragraph is general, and does not relate alone to the application of proceeds derived from the sale of lots, but to payments of all kinds, regardless of the sources thereof. Hence the language employed is comprehensive enough to cover all possible cases. The phrase "first maturing obligation" does not look to the future alone; it means the obligation longest overdue, or the one next to mature, as the case might be. In either case, the obligation would be the "first maturing" one. So, also, if at any time $1,000 is paid on account of the principal sum of $125,000, the interest on that amount ceases. If it happens that the application is upon a matured portion of the $125,-000, the provision is unnecessary; but, inasmuch as payment might be made upon either a mature or an immature item, the general language is very properly employed.

It is not necessary to consider the extreme limit to which the right of release would under any circumstances extend, or to determine whether it would or would not exist after the plaintiff had taken legal steps to enforce its security, or had declared the beneficiary's default and had declined longer to recognize his right to complete the purchase under the terms of the contract. The money procured from the disposition of the 30 lots was to be used to discharge the beneficiary's obligations, and the plaintiff having promised to accept it, and waive past defaults, actual payment to the trustee operated to reinstate the beneficiary and reinvest him with the right to proceed with the purchase upon the terms specified in the contract. He was not repudiating or abandoning his obligations, but was performing them.

We have examined the numerous cases collected in the briefs, but most of them may be dismissed with the suggestion that they are readily distinguishable because of provisions in the contract unlike those here

involved. Of the others, some tend to favor one side and some the other, and they are so equally divided' that it cannot be said that there is any decisive preponderance. Those most clearly supporting the plaintiff's contention, perhaps, are Clarke v. Cowan, 206 Mass. 252, 92 N. E. 474, 138 Am. St. Rep. 388, Fulton v. Jones, 167 App. Div. 765, 153 N. Y. Supp. 87, and Stephens v. Keen, 68 Fla. 558, 67 South. 226; and those for the defendants are Vawter v. Crafts, 41 Minn. 14, 42, N. W. 483, Gammel v. Goode, 103 Iowa, 301, 72 N. W. 531, Nims v. Vaughn, 40 Mich. 356, Lane v. Allen, 162 Ill. 426, 44 N. E. 831, Am. Net & Twine Co. v. Githens, 57 N. J. Eq. 539, 41 Atl. 405, and Chrisman·v. Hay, 43 Fed. 552. And in connection with Clarke v. Cowan, see Clark v. Fontain, 144 Mass. 287, 10 N. E. 831. While the question is not entirely free from doubt, in view of the fact that there is no limitation expressed or clearly implied in the contract, we are inclined to hold that, under the circumstances existing at the time, the trustee was justified in concluding that it should yield to the beneficiary's demand for releases of specifically designated lots, at the rate of one for each $1,000 paid upon the condition and with the understanding that such releases would be given. It is not thought to be important that conveyance of legal title to the lots had not been actually made to the beneficiary, or upon his order, when the suit was commenced. It was sufficient that the trustee had declared that it held the legal title· subject to his order.

[5] It is to be added that, even if these doubtful questions were to be resolved in favor of the plaintiff, still it could not succeed. In good conscience it cannot hold the $30,000, and at the same time take back the entire consideration for which it was paid. True, the beneficiary made payment upon account of an obligation he was generally bound to discharge; but he paid· with the understanding and upon the consideration that the lots would be released. But, be his rights what they may, the loss here would fall primarily upon either the third parties, who actually furnished the money that went to the plaintiff, in reliance upon the promise that the lots would be released, or upon the trustee. There is no suggestion of fraud or bad faith on the part of the trustee or any purchaser or creditor. The most that can be said is that they acted under a mistaken view of the law and of the meaning of the contract. Strictly speaking, perhaps, it is not a case for the application of the principle of estoppel against the plaintiff, for apparently it was without knowledge of the sources from which the funds were derived or the understanding upon which they were turned over to and received by the trustee. But the plaintiff is here seeking equity, and it must·do equity. Upon learning, in December, 1913, what had been done, if it desired to repudiate the transaction as being unauthorized, it should have tendered back the money which it had received; this it did not do, and does not now offer to do. It would be our duty to decline to aid it in any effort to profit by reason of the mistake.

[6] It remains to consider other assignments of minor importance. Plaintiff complains of those portions of the decree authorizing the trustee, subject to the supervision of the court, to make a sale of the

premises, investing it with discretion to sell in parcels or in one body, and awarding it $500 as compensation and $250 on account of attorney's fees. While under the circumstances we are inclined to think it would have been better if a special master had been appointed, with the requirement of bond and official oath, we cannot see how the plaintiff can be prejudiced in so far as the trustee is authorized to perform only ministerial functions. It is quite apparent, however, that over the objection of the plaintiff the trustee should not be invested with discretionary power. There can be no doubt that a feeling of antagonism has developed in the course of the litigation. The plaintiff has made charges of improper conduct against the trustee, and these it resents. Besides, the issues here have been such as to make the trustee and the beneficiary natural allies in the litigation. While not implying that the trustee would be consciously moved by such considerations, we cannot close our eyes to human frailty, and surely no litigant would be satisfied with a juror whose judgment is subject to such disturbing influences. With much show of reason, plaintiff contends that the tract should be sold as a whole. If, as it argues, steps should be taken to vacate the apparently absurd and indefensible plat, the sale of a lot here and there in the tract would render efforts to that end extremely difficult, if not entirely futile. The only assurance the beneficiary can rightfully demand is that the property bring the highest aggregate amount which it is possible to obtain. This assurance he will have, if the trustee is directed first to offer the tract in parcels, such as the defendant may designate, and then to offer it as a whole, and to accept, subject to confirmation by the court, the bids or bid which will yield the largest return.

Accordingly the cause will be remanded, with instructions to modify the decree in such manner that it will so direct. With this qualification, it will be affirmed. We find no sufficient ground for disturbing the allowances for compensation to the trustee and for attorney's fees. No costs on appeal are awarded.